states against Betts-Gaston. Ms. Bonjean, can you hear us? Yes, good morning. All right, please proceed. May it please the court. Good morning, counsel. Your honors, I represent the defendant Avalon Betts-Gaston. Avalon Betts-Gaston's constitutional guarantees of a fair trial were denied at all stages of her trial in this matter. As the court is aware that in 2006, Ms. Betts-Gaston and her teamed up to start a foreclosure assistance program known as IJCN. Ms. Betts-Gaston was charged with two counts of wire fraud related to two separate transactions that IJCN handled. I'd like to focus briefly on count two of the indictment which the defendant contends was not proven beyond a reasonable doubt by the government. Count two involved a homeowner by the name of a day or so after a home that he had placed in IJCN's program. The record is devoid of any evidence direct or circumstantial that Ms. Betts-Gaston had knowledge of any false statements that were contained in the loan application as it relates to that particular property. The loan application is undisputed was completed by the co-defendant. The borrower on that loan application was the co-defendant's mother. No witness including the cooperating co-defendant witness Ms. Dimona Ross testified that my client Ms. Betts-Gaston had reviewed the application, had ever seen the loan application, knew even what type of loan product was involved, knew who the lender was, knew anything about this particular loan application. The record is simply devoid of any evidence to support that. In addition, we know that Charles Kimiak was not present to testify at his trial. He was not present to testify whether he had proper notifications about how IJCN worked, whether he understood that he was placing his home in this program, what was involved with that. We do know that he was present at his closing which would certainly strongly suggest that he knew he was selling his home. So as to that particular homeowner, there's simply no evidence that he, it was a scheme to defraud him, that he went into this program without full understanding of how the program operated, particularly since he had signed all the paperwork associated with the program and was actually at his closing. Counsel, the government has told us that your client told an ARDC investigator that she arranged that transaction. Is that right? It is undisputed that her company IJCN arranged the transaction. Yeah, that's not an issue. Did your client tell the investigator that she personally arranged the transaction? That she personally arranged, well, she personally arranged the transaction after Charles, I think, Kimiak. Yeah, yeah. So she dealt with that homeowner. I don't think that's in dispute. The question is whether Mr. Kimiak was aware of the terms of IJCN and there's no evidence that he wasn't or that he didn't think he was selling his house. We have no testimony from Kimiak. We have no statements from Mr. Kimiak. He was not present at trial to testify and he was at his own closing. So it's our position that notwithstanding the fact that Ms. Betz-Gaston may have fully admitted, and I think she did multiple times, that she was involved in engaging Mr. Kimiak in the IJCN program or she was involved in helping him get his house into the program, that in and of itself wouldn't satisfy the government's burden. Without there being some evidence that Mr. Kimiak wasn't informed of the terms of the program, there's just no evidence that there was any scheme to defraud him. And it's our position that the government failed to present any type of evidence to support that inference. The government does suggest that with respect to false statements, alleged false statements in the loan application, that Ms. Betz-Gaston, she would have known that the house or the property was not being used for a lawful purpose. Again, before we can even get to whether or not Ms. Betz-Gaston knew anything about this loan application, which we argue she did not, there's no evidence to support she did anything about the details of this loan application, there's no evidence that Ms. Betz-Gaston would have known what was checked on that particular loan application, how the house was being used. Similarly, there's no indication that Ms. Betz-Gaston would have known that there was a box to check of where the funds were coming from. And notably, the box to check is just whether it's coming from checkings or savings. So that in and of itself isn't even a false statement. So I think our brief sets forth this argument, it's our position that the mere fact that Ms. Betz-Gaston admitted to the ARDC investigator or anyone that she arranged for Mr. Kimiach to put her house into this program is not sufficient evidence that she committed wire fraud as it relates to this particular property. As the government has conceded, there's nothing inherently unlawful about how a program operates like this, so long as the homeowner is fully apprised and aware of what he's getting himself into. And we have no evidence that he wasn't, particularly since he was in fact at his closing. In addition to reversing count two of the indictment, defendant argues that both judgments of the conviction must be reversed, where Ms. Betz-Gaston simply did not get a fair shake at this trial. No one expects a perfect trial, certainly, but Ms. Betz-Gaston really didn't have a shot from the beginning. One of her primary defenses was that even if you believe, jury, that she had knowledge of false statements in the loan applications and possessed an intent to defraud lenders, even if you believe both those things, which we vehemently alleged were not true, but let's just say you believe that, the types of false statements in these loan applications were not capable of influencing the lending decisions of these particular lending institutions. The district court judge didn't simply deny the defendant the opportunity to challenge this or refute this element of the offense. The trial testimony shows that the government put on two bank witnesses, one from Fremont and one from American Home Mortgage, and with very few questions was able to establish if someone inflated their income on a loan application, could it have influenced the lending decision? Yes. If someone misstated how they intended to use the property, could it have influenced the lending decision? Yes. So with a matter of three or four questions, the government was able to put on their evidence that the materiality element of the offense had been satisfied. Ms. Betz-Gaston was denied the opportunity to rebut or refute that testimony. First, she was not given the opportunity to present specialized testimony about these particular lending institutions at this particular time and with these particular loan products. Fremont and EHM, it is well recognized, utilized a business model that depended on making huge volumes of loans. These lenders profited from the high transaction costs associated with these loan products, namely stated income loans, and they unloaded the risk associated with the loan almost immediately and in one case even before they even closed on the loan by selling them loans off for full principal value into a secondary market. This information was outside the canon of the average juror and it's even outside the canon of the average lawyer. I didn't even understand this going into this and this was a tool that the jury could have used in assessing whether to credit the conclusory testimony of the Fremont and American Home Mortgage representatives. The district court judge insisted and I think the government to some extent insist that, defendant is simply trying to make a reliance argument and that's just not the case. In fact, whether the lenders would have made the loans irrespective of the misstatements is really beside the point, although I suspect they would have, but that's not the point of this argument and as this court is held in Reynolds, the question of materiality is the issue of the nature of the types of statements and not only the nature of the statements but certainly the types of lenders that we were dealing with here, the types of loan products, would have allowed the jury to conclude, you know, I'm not sure I believe that these misrepresentations that we're talking about really could have influenced these lending decisions. In fact, I think maybe that they were inviting these types of invitations because they had no worries about whether or not this loan was ever going to be repaid since they were going to sell it off in a matter of a month or even before the closing happened. And those were the tools that were denied to this jury in assessing that, but it goes beyond that. It's not just that the tools of expert or specialized testimony were denied to this jury, but through cross-examination, defense was greatly hampered in terms of how to There are specific examples of questioning of Fremont representatives and American Home Mortgage representatives that were stifled and it was telegraphed to the jury from the very beginning that whether or not these lending, whatever these lending institutions were, whether they were subprime mortgage lending institutions, is not irrelevant to anything you have to consider. The judge routinely telegraphed to the jury that any suggestion on the part of the defense that the lending practices of Fremont and HHM was relevant to anything should be disregarded. This was an attitude of the court that was pervasive through trial and there's no question that the jury got the message loud and clear. To add insult to injury, frankly, even when counsel attempted to get clarification of the court's ruling and to try to make an appropriate appellate record to understand, is the court just not allowing expert testimony? Is the court not allowing any reference of a subprime mortgage lender? It was impossible. It was impossible to get the judge to clarify that ruling. The record speaks to it and it was also, and again, another layer of prejudice to the defendant was that because the court refused to hold sidebar hearings and refused to do any pre-trial conferences or any conferences outside the presence of the jury, everything had to be done in front of the jury, which was exceedingly prejudicial to the defendant. A cold record cannot capture how difficult it is to preserve a record, make arguments that are valid arguments, and in the process to be admonished over and over again. And this goes to sort of the fundamental underpinnings of the arguments that I've presented in my brief here, is that yes, this is an evidentiary issue, but it's more than that. As I set forth in argument three of the brief, that the whole tone of this trial was prejudicial to the defense. Attorneys who choose the path of litigation are generally thick-skinned and can accept that judges may have different personalities. Some may be irritable, some may be even rude, but no attorney should have to deal with contemptuous district court judges. That's not what our system is about. And it's not really about whether it hurts an attorney's feelings or whether it even degrades an attorney, which it did. More importantly, it's about the impact on the litigant's rights. And throughout this trial, the district court telegraphed the jury in any number of ways that the defendant was not entitled to the counsel. It's interesting that you use the word contemptuous. In going through the transcript, I found a number of statements by you that would have provoked a lot of other judges to at least mention that word and send a warning to you. Question, are you advocating for the government now? I didn't realize the court was doing recross for the government. That is absolute abdicating your job as a judge. I didn't realize the court was a finder of fact. If the court would like to take off its robe and come down here and do the government's job for it, it certainly can do that. Those are a few selections. Tell us why we should treat this as misbehavior by the district judge as opposed to baiting by you. Judge, and I apologize since I'm on the phone that I cannot tell which judge I'm speaking with. Judge Hamilton. Your Honor, the only way that I can respond to this is that this was a very difficult trial from beginning to end. There was no opportunity to raise issues with this court, with the district court judge. Those statements that the court has identified were said, and there are different statements throughout the trial, and I think I know the record well enough to know when they were said, but when a district court judge has taken over an attorney's examination of a witness on recross examination and then dismisses that witness from the bench without allowing the attorney to do his or her job, and that's what happened. It was clear that the judge had taken over the role of the prosecutor at that point. A judge is certainly entitled to clarify any testimony that was unclear, but a judge isn't entitled to take over and act as an advocate, and this was not something that happened once or twice. It was happening from the very beginning, from the minute I stepped in that courtroom. It was impossible to do my job. There is no scenario under which I have, as a litigator, you have an interest in battling with the judge, but the district court judge refused to hold any sidebars so that any of these issues could be vetted. The record shows, and he did not even deny, that throughout these proceedings there were contentious facial expressions. There was an attitude that was telegraphed to the jury that made it impossible, and in order to attempt to respond to that and still preserve my client's rights, yes, things got heated at various points, and I understand that without taking the whole record in context and just cherry-picking a couple statements, it might seem that the attorney was contemptuous, but the record shows that I tried very, very hard to respect the judge's wishes, get clarity, do my job, protect my client's Sixth Amendment rights, and the district court judge simply was resistant to that from the beginning and did advocate for the court. It did advocate for the prosecutor. I mean, I believe that that's what happened, and I think the record reflects it. This isn't a personal thing about, you know, it wasn't about trying to goad the judge. It was trying to, in a situation that was almost impossible to protect my client's rights, where not only was there a prosecutor trying to convict her, but from my perspective and from what the record, I think, reflects, there was a district court judge that was helping along unfairly. Counsel, you have only three minutes left. Do you want to reserve any time for argument, for rebuttal, sorry? Yes, Judge, I will reserve the remainder of my time for rebuttal. Okay, thank you. Thank you. Mr. Lee. Thank you. May it please the court, my name is Steven Chonley. The district court did not abuse, going back to the issue as to the expert whom the defendant planned to call, the district court did not abuse its discretion in barring this expert, doing so first in a written ruling, finding that the proposed opinions went to reliance and not to materiality, were not relevant and should be excluded. And the district court did not abuse its discretion in also granting the government's motion to bar evidence of victim's negligence or misconduct themselves. Those rulings were both done prior to the trial beginning. The judge did not abuse discretion in granting those motions. Regarding count two of the indictment, a properly instructed jury heard properly admitted evidence that the defendant created and participated in a scheme to use straw buyers to obtain equity from various homes, including the chemic home and the straw buyer who was used in that transaction. And the defendant has failed to show that no reasonable trier of fact could have found, based on all the evidence and the reasonable inferences drawn therefrom, that the defendant participated in such a scheme. The defendant was herself a real estate attorney who was familiar with loan applications and with mortgage documents. She knew that the straw buyer was buying the property under false pretenses and intended to deed the home back to a company controlled by the defendant immediately after the closing, thus showing that the defendant knew what the straw buyers was engaged in a sham transaction. And the defendant knew that the homeowner wanted to save his home even while she was arranging a transaction that resulted in him having no legal rights whatsoever in the home that he wanted to save. Based on all this, this jury here found the defendant guilty, and the defendant has not shown that no reasonable trier of fact could have reached such a conclusion. In terms of the District Court's courtroom management, the District Court did not abuse its discretion in managing its courtroom, and there's nothing in the record that indicates that the District Court based its evidentiary decisions on anything other than the specific questions that were being asked and the topics that were being raised by such questions. In particular, counsel referred to one particular incident involving a representative of one of the lenders at issue in this case, a man named Norm Iconin, who used to work in Fremont. She's referring to the District Court cutting off her recross examination of that witness. I think it's helpful to clarify exactly what happened there. That witness had testified on length. The government, on its recross, asked various, I believe only a handful of questions designed to have the witness just read into the record some statements on the document, and then the defense counsel began recross examination. The recross examination went on for far longer than the redirect had been, and the District Court did not abuse its discretion in ending the recross examination when it went beyond the scope of the redirect and when it began going to topics that had been covered earlier in the witness's testimony. Once the court has any further questions. I do have a few questions, Mr. Lee, about some of the friction between the district judge and defense counsel. At one point, my notes say page 439 of the transcript. I'm not sure who the witness was, but I believe defense counsel was trying to approach a witness to show a document. The district judge refused to allow her to do so because the document was not in evidence. Usually, you have to show a document to a witness before you can get it into evidence, at least if it's going to be contested. What was going on there? Do you recall the incident? I don't recall the specific document that was being attempted to be in evidence, and the District Court did not abuse discretion in requiring the defense counsel to recall that witness later in her case. This was Spikes Davis? Yes. Did defense call her as a witness? No, she did not, and I don't believe she admitted that document later in her case. There was another incident a little later where defense counsel wanted to have her assistant at her table, just as you had your case agents at your table, to help with documents and so on. The District Court didn't allow that. Can you give us something, and instead said that you all would have to help her in her presentation of evidence. Do you recall that? Yes, the District Court denied at the beginning of the trial, defense counsel asked the District Court if she could have her assistant sit with her at counsel table. The District Court denied that request later during the trial. Is that fair? You get to have your assistants, your case agents there? The District Court, I don't believe it abuses discretion in granting that, in denying that request. Also, the defendant's counsel ultimately suffered no real prejudice from that. She still able to show the documents through, there's no indication through the course of the trial that she was not able to show documents to witnesses at appropriate times. The government did assist her at times in presenting documents, as we customarily do. That's customary in this district? Well, the government will present, will show, will assist when necessary in presenting documents during the course of a trial. Ultimately, the District Court's decision there, it was not an abuse of discretion in terms of how it manages courtroom to limit defense counsel to having only counsel sit at table. And later, during the course of the trial, it was not entirely clear, I think, from the record whether the District Court specifically prohibited the assistant from helping her at various points during the trial. And that particular moment, the government, there was no prejudice again because the document that was being attempted being shown was shown to the witness. Let's, of course, any further questions? Could you talk about the scope of Vordier, the way I pronounce it? We were dealing with a trial here that had some potential for jury emotions, people's experience in dealing with the subprime mortgage practices that caused so much damage to the economy that hit us, most of us, in 2007, 2008, and later. What questions did the judge ask in Vordier? And did he allow counsel to submit questions and then ask them? Both the government and defendant did submit questions ahead of trial for Vordier. And the District Court said it reviewed those questions, and the District Court asked the questions itself. In the course of the first panel of six potential jurors, the District Court did ask questions as to whether the potential jurors owned their own homes and, I believe, the status of those homes, but definitely whether they owned the property themselves. Currently. Yes, and the length in which they own their homes. After the District Court concluded its questioning of the first six potential jurors, the District Court held a sidebar with the government and with defense counsel. Neither side raised any objections to how the District Court had handled the questioning of those potential jurors, and both sides proceeded with preemptory challenges or caused challenges if they deemed necessary or warranted. Neither defendant nor government raised any objections. The only problems, only issues that defense counsel raised were later on with regards to three specific jurors, the questioning of three specific jurors, where there the defense counsel asked for more information about two specific jurors, and the District Court denied that request. But that was related to specific questions, not about mortgages or home ownership in general, just about specific questions and answers that the potential jurors, those two potential jurors had and the defendants suffered no prejudice from its questioning, especially given the lack of any objections to the District Court's questioning of the first six potential jurors. Unless the court has any further questions, the government asks you to affirm the conviction and the verdict. Anything further, Ms. Bongean? Just briefly, Your Honors. The record is very clear that I did request for assistance at counsel table and the judge denied it and relegated my assistance to the gallery where she could not access any documents or be of any assistance to me. That request was again renewed, unfortunately, in front of the jury because there was no opportunity, and I want the record to be issued with the judge outside the presence of the jury. The judge walked on with the jury and the judge walked off with the jury and never came on the bench in between to address the issues that may have come up, which made it very difficult to address these issues. There were times when the judge ordered me to put documents up that I didn't even intend to have the witness look at, and it seemed frankly as to, you know, again, I was there when you're doing an examination and trying to deal with electronics to get documents up, and even when you don't feel like you need the documents up, being ordered to display them to the jury seemed, when the judge had never done that for the government, seemed like an effort to impede the examination, and that's the only inference that I can draw. Regardless, it was exceptionally difficult to do my job in the process. At one point, there was just a wire transmission that was made up completely of numbers almost, a few words here and there, that had a very, not a particularly important point in the direct examination, but the judge had the defendant read out the transmission beginning to end, which was just numbers. There's no good purpose behind it other than, again, it was, you know, it was something that the district court wanted to do that for the purpose of clarifying anything. It didn't serve to clarify anything. So, again, a cold record is kind of, it's very difficult to show what happened in this courtroom, but one thing is certain. The defense was denied the opportunity to have assistance. Now, with respect to the voir dire, it's important to understand that the judge did ask us, or we were permitted to submit questions. There was no discussion about the questions. The judge said, I looked at him. I'll take care of it. That was pretty much it, and that's, and the judge didn't even indicate to the parties how he was going to conduct voir dire. It wasn't until we started going through voir dire that it became clear that it was going to be such a superficial process from the defense standpoint, and at that point during sidebar, I did attempt to indicate, Judge, this, I don't have enough information to make meaningful decisions here. There are no case-specific questions. Even when somebody offers up that they might have an issue, it would be, the response from the court was, would it impact your ability to be fair? Well, no, but, and that was it. That happened routinely, and for Mr. Lee to suggest that I didn't object is just simply not what the record reflects. I had to do this with a jury sitting in the room at all times, which made it exceedingly difficult, and lastly, Judge, it's your honors, I would ask that the court consider certainly the sentencing arguments that the defendant was entitled to challenge the loss amount. The loss amount was greatly exaggerated. There was no supporting evidence behind it, and the defendant did put affirmative evidence forward to say these loss amounts are not, under any definition of loss amount, are not valid, and we should be able to challenge them, particularly as it relates to the one property that was never mentioned until it showed up in a memorandum by the government to the probation department. With that, the defense has no further argument unless the court has some under advisement. Our next case for argument today is United States against